**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

        **v.**                    **07-CR-126A**

**SHANE BAKER and SHAWN BAKER,**

        **Defendants.**
_____


## REPORT, RECOMMENDATION AND ORDER

        This case was referred to the undersigned by the Hon. Richard J. Arcara, in accordance with 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon dispositive motions.


## PRELIMINARY STATEMENT

        The defendants, Shawn Baker and Shane Baker ("the defendants") are charged in a multicount Superseding Indictment with having violated Title 21 U.S.C. § 846 (Count 1); Title 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) and Title 18 U.S.C. § 2 (Count 3); Title 21 U.S.C. § 841(a)(1) and Title 18 U.S.C. § 2 (Counts 4 and 5); Title 21 U.S.C. § 856(a) and Title 18 U.S.C. § 2 (Counts 6 and 7); Title 18 U.S.C. §§ 924(c)(1) and (2) (Count 8).

        The defendant Shawn Baker is individually charged with having violated Title 21 U.S.C. § 841(a)(1) and Title U.S.C. § 2 (Count 2) and Title 18 U.S.C.

§§ 922(g)(3), 924(a)(2) and 2 (Count 10).

The defendant Shane Baker is individually charged with having violated Title 18 U.S.C. §§ 922(g)(3), 924(a)(2) and 2 (Count 9).

The government also seeks forfeiture of the rights and interests in certain real and personal property belonging to the defendants as described in Counts 11 and 12 of the Superseding Indictment.  (Docket #70).

The defendants have filed separate motions seeking to suppress the evidence seized from the premises located at 1334 Clinton Street, Buffalo, New York on February 9, 2007.  (Docket #s 45 and 48).  Separate responses to these motions were filed by the government.  (Docket #s 51 and 54).

Thereafter, an evidentiary hearing was held by this Court on January 29 and February 21, 2008.  A transcript of the testimonial proceedings was filed on April 14, 2008.  (Docket #66).  Thereafter, post-hearing memoranda were filed by the defendants (Docket #s 90 and 93), and the government filed a post-hearing memorandum in opposition.  (Docket #94).

This Report, Recommendation and Order addresses the motions filed by both defendants.

## <u>FACTS</u>[1]

An investigation was being conducted by agents of Immigration and Customs Enforcement ("ICE") of the Department of Homeland Security of the defendants Shawn Baker and Shane Baker as well as an individual by the name of Jeremy Henderson[2] with respect to illegal drug transactions by these individuals. Special Agent ("S.A.") Grant Friday testified that an informant had advised him that Jeremy Henderson "was involved in narcotics" and that "he was distributing ecstacy" and that "he had a quantity of ecstacy back at his apartment" located at "1334 Clinton Street in Buffalo." (T. 68, 99-100). Further investigation established that Shane Baker, Shawn Baker and Jeremy Henderson "all resided at 1334 Clinton Street" and that there were two apartments on the second floor of that premises; a rear apartment and a front apartment. It was believed that "Henderson and Shane Baker lived in the rear apartment" and "that a female named Jennifer Cheman lived in the front apartment." (T. 70-71, 101).

---

[1] The facts herein are taken from the transcript of testimony given at the evidentiary hearing conducted by this Court on January 29, 2008 and the exhibits received therein as well as from the submissions made by the parties herein. References to the transcript (Docket #66) are designated " T" followed by the appropriate page(s) number.

[2] Jeremy Henderson was indicted as a co-defendant along with the defendants Shawn Baker and Shane Baker (Docket #1) but died on December 12, 2007. As a result, an order dismissing the indictment against him was issued on December 14, 2007. (Docket #57).

The informant had also advised that while she had been at the residence apartment with Jeremy Henderson, she was shown "an assault type rifle" by Shane Baker. (T. 72).

Arrangements were made by the agents for two purchases of ecstacy "at 1334 Clinton Street." During the second controlled purchase in the second floor rear apartment of Henderson, Shawn Baker "had gone through a door in the rear of the living room" in this apartment and then returned to the rear apartment living room through the same door with a quantity of ecstacy pills. However, it was not known where that door led to. (T. 74-75, 109-110, 127, 135; Government Exhibit 4).

Thereafter, a search warrant authorizing the search of the "entire premises except upper front apartment" located at 1334 Clinton Street was issued by this Court on February 8, 2007. (Government Exhibit 5) (T. 69-70, 101-102). Prior to the execution of this search warrant on February 9, 2007, S.A. Friday briefed members of the Buffalo Police Department S.W.A.T. team about the building to be searched, including "the residence and the background of the case." He further advised the team members that he "expected Shawn Baker, Shane Baker and Jeremy Henderson to be in the location" at 1334 Clinton Street and provided them with a description of the "layout" of the premises, including a diagram of the second floor rear apartment based on the information provided by the informant. (Government Exhibit 1) (T. 8, 9, 22, 73-74, 129).

S.A. Friday further advised the S.W.A.T. team "that during the second controlled purchase, the subject [they] identified as Shawn Baker had gone through a door in the rear of the living room in the second floor of the apartment (sic) where he obtained the ecstacy pills and returned through that door." He told the team members that they "weren't sure of (sic) where that door went" and that "based on the CI information, [they] weren't able to determine if that was into a bedroom, just the second room, what actually the back door - - how that door pertain[ed] to the layout of the building or the layout of that apartment." However, it was stated to the team "that drugs definitely were obtained through (sic) going through that door in the rear door (sic) of the living room, which [S.A. Friday] pointed out to them on the diagram [Government Exhibit 1] where that wall, (sic) basically, it was an unknown, but it had been in play during a controlled purchase." (T. 74-75, 109-110, 127, 129).

At 6:35 a.m. on February 9, 2007, the search warrant for the premises at 1334 Clinton Street (Government Exhibit 5) was executed by members of the S.W.A.T. team and ICE agents. Entry to the premises was first made by the S.W.A.T. team who initially conducted a safety sweep of the second floor rear apartment where they found Jeremy Henderson and Shane Baker. (T. 13, 49-50). Since the officers had been advised that there were three people involved in the drug operation and only two individuals had been found, the officers continued conducting a safety sweep on the second floor of the building looking "for other people." (T. 13).

Detective Daniel Rinaldo, a member of the S.W.A.T. team, "exited a door on (sic) the second floor rear apartment which led to a small hallway and in that hallway there was another door almost directly in front of it."  (T. 13, 27-28).  He and two other S.W.A.T. team members knocked on this door and announced "police."  The door was opened, and in response to Detective Rinaldo's question, the individual identified himself as Shawn Baker.  (T. 14-15, 53-54, 55-56).  When the door was opened, Detective Rinaldo smelled a "strong [odor] of marijuana."  He also observed a female standing in the apartment who was later identified as Jennifer Cheman.  At this point, Detective Rinaldo knew "that [this] was the front apartment to those premises."  (T. 15-16).

Detective Rinaldo knew that the search warrant expressly excluded the second floor front apartment.  (T. 43).  However, "based on the fact that [he] was given this name [Shawn Baker] as a person being involved in the operation and the fact that [they] had already recovered an assault weapon in the rear apartment," he asked Shawn Baker and Jennifer Cheman "to sit down on the couch" and directed Officer Beaty "to stand with them" while a security sweep of this apartment was conducted.  (T. 16-17, 30-32, 56, 62-63).  In response to a question by this Court, Detective Rinaldo admitted that he did not ask for permission to enter the second floor, front apartment when Shawn Baker opened the door to same in response to his knock.  (T. 66).

It was during this safety sweep of the second floor, front apartment that he observed "a marijuana grow operation" consisting of "dozens of potted marijuana plants with a lighting system." This safety sweep of this apartment lasted approximately "30 seconds." He then directed Officer Beaty "to handcuff [Shawn Baker] and the girl." (T. 18-19, 33, 57-58).

Thereafter, Detective Rinaldo "gave [S.A. Friday] a brief synopsis of what happened when [they] executed the warrant, and at some point after that the scene was turned over to him [S.A. Friday] and other people from I.C.E." (T. 19). S.A. Friday testified that he was advised by S.W.A.T. officers "that when they knocked - when they made entry and completed the securing of that rear apartment area, they had opened one door and knocked on the inner door of the rear of the living room, there the door was answered by an individual who identified himself to the officers as Shawn Baker and they recognized the name because they (sic) briefed them as part of the investigation. They told me they had him sit down and they conducted a security sweep of the apartment during which they found a marijuana grow operation in the front room of the apartment." (T. 80).

S.A. Friday further testified that after he received the information from Detective Rinaldo, he "basically just got an overall observation of everything in the [second floor front] apartment and just got [his] bearings [which he] got quickly and got a glance at the grow and basically [he] just got everything set up for the other agents with [him] to initiate their searches of the apartment building as a whole." (T. 80-81).

S.A. Friday entered the second floor front apartment "through a door at the back of the living room from (sic) the second floor rear apartment. Approximately "four or five minutes" had elapsed "from the time [he] first entered 1334 Clinton Street and [when he] saw Shawn Baker sitting on the couch in the [second floor] front apartment with his girlfriend, Jennifer Cheman" with a "S.W.A.T. officer maintaining custody of them." (T. 80-81).

Thereafter, S.A. Friday contacted the U.S. Attorney's Office "to advise that a security sweep had to be performed on the second floor front apartment and that during the security sweep, a marijuana grow operation was discovered in plain sight and just to get guidance and direction from the U.S. Attorney's Office." (T. 88). After discussing the matter with the U.S. Attorney's Office, "the initial decision was made to discuss the situation with Shawn Baker in an attempt to obtain consent for the apartment, and if consent was (sic) not granted, [they] were going to proceed with applying for a search warrant for that apartment as well." (T. 88).

S.A. Friday interviewed Shawn Baker for purposes of obtaining his consent to allow the agents to search the second floor, front apartment and advised him that "if consent was not granted, [they] were going to proceed with applying for a search warrant for that apartment." He further advised Shawn Baker that "due to the fact that a security sweep had been performed for the officer safety of the S.W.A.T. team and for [the agents] coming in afterwards" in the second floor, front apartment, whereby they "found the marijuana grow operation in plain sight," they "would have enough to apply

-8-

for a search warrant."  (T. 87-89).

S.A. Friday also told Shawn Baker "that he would not be taken into custody if he was cooperative" but that he did not have to sign the consent form if he chose not to.  (T. 89, 94, 112, 130, 132).

Jennifer Cheman advised S.A. Friday that "she was actually the primary tenant [of the second floor, front apartment]; it was actually her apartment that she actually was responsible for paying the rent to Shane Baker, [but that] Shawn [Baker] did pay part of the rent, but it was actually her apartment and she actually, physically gave the rent money to Shane Baker on a monthly basis for the apartment."  (T. 89-90).

S.A. Friday then advised both Jennifer Cheman and Shawn Baker that they did not have to consent to a search of the front apartment and that "if they did not consent, [they] were going to apply for a search warrant and proceed on that route."

Shawn Baker and Jennifer Cheman then "agreed to consent to search the apartment" and signed a Consent To Search form (Government Exhibit 14) on February 9, 2007.  (T. 89-92, 112).  At the time that Shawn Baker signed the Consent Form, S.A. Friday considered him as being detained.  (T. 112).

Upon execution of the Consent To Search form, the agents searched the second floor, front apartment and found the "marijuana grow operation" along with a

"box containing 21 shotgun shells, triple beam balance or scale, and plastic shot glass type containers and lids, which were (sic) packaging that was used and identified in the investigation that was used in selling and distribution of marijuana from that apartment, in the rear apartment."  (T. 93).

A further search of the building at 1334 Clinton Street established that access to the third floor of the building could not be gained "by an outside door." Instead, there is a "stairwell from the living room area of the second floor, rear apartment that accesses the back half of the third floor" and also a "stairwell from that small hallway between the apartments that accesses the third floor."  (T. 87, 110, 120-121).  A "hidden" or sealed room was discovered in the third floor area and access to that "hidden" room was obtained through the ceiling located in the second floor, front apartment.  A search of this "hidden" room "revealed a hidden marijuana grow operation."  The agents considered this "hidden" room on the third floor to be covered by the search warrant for the premises at 1334 Clinton Street.  (T. 95-96, 99, 111, 117).

A loaded AR15 rifle was found "in the bedroom off the living room in the second floor rear apartment" and "a [loaded] shotgun" was "located on the third floor access from the second floor rear apartment."  Also found and seized was "a shotgun on the bed in the second floor, rear apartment which was Shane [Baker's] room.  (T. 80, 117).

## <u>DISCUSSION AND ANALYSIS</u>

The defendant, Shawn Baker, joined by the co-defendant Shane Baker, argues that the "warrantless search of [his] upper, front apartment" on February 9, 2007 "violat[ed] [his] Fourth Amendment right against unreasonable searches and seizures." (Docket #93, p. 3). He further argues that the search of this front apartment cannot be justified as a "protective sweep" or a "consent search." (Docket #93, pp. 11, 14). Lastly, he asserts that the search of the enclosed room on the third floor of the premises located at 1334 Clinton Street was illegal since that room constituted "part of the front apartment" on the second floor of the premises. (Docket #93, pp. 20-21).

In joining in the co-defendant Shawn Baker's motion to suppress, the defendant Shane Baker claims that he "has standing [to do so] based upon a reasonable expectation of privacy he had in the second floor front apartment" since "he had maintained a set of keys for the second floor front apartment and reserved the right to enter the premises if he so chose." (Docket #90, p. 6; Docket #48-2, ¶s 3-8). He also argues that the seizure of the weapon from his second floor rear apartment was illegal since the "officers testified that there was nothing illegal about the weapon." (Docket #90, p. 10).

The defendant Shane Baker also asserts that the search warrant of February 8, 2007 for the premises at 1334 Clinton Street was "overbroad" and that "the search of the third floor of the apartment (sic) of the premises likewise became a general search for evidence" and therefore, "the evidence found on the third floor of the

apartment (sic) must likewise be suppressed."  (Docket #90, p. 10).

Counsel for the defendant Shane Baker argues "that a hearing is necessary in order to establish the configuration of the premises so that the record will be complete as to counsel's argument relative to the search warrant itself."  (Docket #90, p. 10).

In response and in opposition to the positions asserted by the defendants, the government argues "that the defendant, Shane Baker lacks standing to challenge the search of the upper front apartment."  (Docket #94, p. 2).  As to the search of the second floor front apartment, the government responds to the arguments of both defendants by claiming "that the initial entry and protective sweep of the upper front apartment was justified based upon exigent circumstances establishing reasonable suspicion that the apartment may [have] harbor[ed] individuals posing a threat to the officers executing the search warrant on the other portions of 1334 Clinton Street." (Docket #94, p. 6).  As an alternative, the government claims "that the apartment was later more fully searched pursuant to a consent form signed by both the defendant Shawn Baker and Jennifer Cheman."  (Docket #94, p. 6).

## THE SHAWN BAKER MOTIONS

### A.    The Warrantless Search Of The Second Floor Front Apartment:

The Court finds that the defendant Shawn Baker, as an inhabitant of the second floor front apartment and a co-contributor towards the payment of rent for that

apartment, had a reasonable expectation of privacy in said apartment premises.  (T. 89-90).

The Fourth Amendment to the United States Constitution expressly provides that:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

As the United States Supreme Court has ruled:

> The Fourth Amendment protects the individual's privacy in a variety of settings.  In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home - a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their . . . houses . . . shall not be violated."  That language unequivocally establishes the proposition that "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."  Silverman v. United States, 365 US 505, 511, 5 L Ed 2d 734, 81 S Ct 679, 97 ALR2d 1277.  In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house.  Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.

*Payton v. New York*, 445 U.S. 573, 589-590 (1980); *Kirk v. Louisiana*, 536 U.S. 635, 636 (2002).

The Supreme Court further ruled that "it is a basic principle of Fourth Amendment Law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* at 586. This principle has been reiterated numerous times by various courts as reflected by the Second Circuit Court of Appeals' decision in *Loria v. Gorman*, 306 F.3d 1271, 1284 (2d Cir. 2002) wherein the Court stated:

> Subsequent holdings have reiterated that principle and "made clear that any physical invasion of the structure of the home, 'by even a fraction of an inch,' [i]s too much to be tolerated. *Kyllo v. United States*, 533 U.S. 27, 37, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (quoting *Silverman v. United States*, 365 U.S. 505, 512, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)). We believe it is clear that by stepping into the house, Gorman crossed *Payton's* "firm line" and implicated its protections. No invasion of the sanctity of the home can be dismissed as *de minimis*. "'A sane, decent, civilized society must provide some . . . oasis, some shelter from public scrutiny, some insulated enclosure, some enclave, some inviolate place which is a man's castle.'" *Silverman*, 365 U.S. at 511 n. 4, 81 S.Ct. 679 (quoting *United States v. On Lee*, 193 F.2d 306, 315-16 (2d Cir. 1951) (Frank, *J.*, dissenting)); *see Kyllo*, 533 U.S. at 37, 121 S.Ct. 2038 ("[T]here is certainly no exception to the warrant requirement for the officer who barely cracks open the front door and sees nothing but the non-intimate rug on the vestibule floor.").

The fact that the search took place in an apartment located on the second floor of the premises located at 1334 Clinton Street does not in any way lessen the Fourth Amendment protection to the inhabitants of that apartment. "In today's society, the protection of the [Fourth] Amendment of course is extended to the equivalent of the traditional single-family house such as an apartment." *Maryland v. Garrison*, 480 U.S. 79, 90 (1987) (dissenting opinion).

Although this Court issued a search warrant for certain areas of the premises located at 1334 Clinton Street, Buffalo, New York, there can be no doubt that the second floor front apartment was expressly excluded from coverage under that warrant. (*See* Government Exhibit 5). Such specific exclusion was also stated in the Application submitted in support of the search warrant for the premises located at 1334 Clinton Street, Buffalo, New York. (*See* Government Exhibit 4). Further, S.A. Grant E. Friday, the case agent in this matter, expressly stated in his affidavit sworn to February 8, 2007 in support of the warrant application that he was "mak[ing] [his] affidavit in support of a search warrant for the premises known as 1334 Clinton Street, Buffalo, N.Y. ***except the apartment known as second floor front***." (Government Exhibit 4, p. 2, ¶ 3) (emphasis added).

It is also undisputed that briefings were held by S.A. Friday with members of the Buffalo Police Department S.W.A.T. team on February 8 and 9, 2007 before the search warrant for 1334 Clinton Street was executed. (T. 7, 20-21, 73-74, 103).

S.A. Friday specifically advised Captain Maraschiello and Detective Rinaldo of the Buffalo Police Department S.W.A.T. team in his briefings of February 8 and 9, 2007 that the search warrant for the premises located at 1334 Clinton Street "excluded the upper front apartment." (T. 103-104). Apparently in a telephone briefing conducted by S.A. Friday with Captain Maraschiello on February 8, 2007, Captain Maraschiello made a drawing and notes reflecting what was discussed relative to the premises to be searched at 1334 Clinton Street. (*See* Government Exhibit 3; T. 41-42).

Government Exhibit 3 contains a notation, "excludes upper front" which further establishes that the commander of the S.W.A.T. team had knowledge on February 8, 2007, before the warrant was executed, that the "upper front" apartment was "exclude[d]" from the search warrant. Detective Rinaldo admitted that he knew there was "another apartment" on the second floor of the premises at 1334 Clinton Street which was adjacent to the second floor rear apartment. (T. 28).

In enforcing the requirements of the Fourth Amendment, the United States Supreme Court and the Second Circuit Court of Appeals have ruled that "a search must be confined to the terms and limitations of the warrant authorizing it." *United States v. Matias*, 836 F.2d 744 (2d Cir. 1988); *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 394, n. 7 (1971).

Before the S.W.A.T. team officers could invade the private living quarters of the occupants of *the* second floor front apartment, they needed to "have some valid bases in law for the intrusion." *Johnson v. United States*, 333 U.S. 10, 16 (1948).

> In Gouled v. United States, 255 U.S. 298, 302, 303, 41 S.Ct. 261, 65 L.Ed. 647, this Court said: 'It would not be possible to add to the emphasis with which the framers of our Constitution and this court (in Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746, in Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, L.R.A. 1915B, 834, Ann.Cas.1915C, 1177, and Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (24 A.L.R. 1426)) have declared the importance to political liberty and to the welfare of our country of the due observance of the rights guaranteed under the Constitution by these two (Fourth and Fifth) Amendments. The effect of

the decisions cited is: That such rights are declared to be indispensable to the 'full enjoyment of personal security, personal liberty, and private property'; that they are to be regarded as of the very essence of constitutional liberty; and that the guaranty of them is as important and as imperative as are the guaranties of the other fundamental rights of the individual citizen-the right to trial by jury, to the writ of habeas corpus, and to due process of law.  It has been repeatedly decided that these amendments should receive a liberal construction, so as to prevent stealthy encroachment upon or 'gradual depreciation' of the rights secured by them, by imperceptible practice of courts or by well-intentioned, but mistakenly overzealous, executive officers.'

*Id.* fn. 8.

This basic constitutional principle was reiterated by the United States Supreme Court by stating that "unreasonable searches or seizures conducted without any warrant at all are condemned by the plain language of the first clause of the [Fourth] Amendment."  *Payton v. New York, supra* at 585; *Kirk v. Louisiana, supra*.

The United States Supreme Court has admonished that "exceptions to the warrant requirement are few in number and carefully delineated and that the police bear a heavy burden when attempting to demonstrate an urgent need that might satisfy warrantless searches or arrests."  *Welsh v. Wisconsin*, 466 U.S. 740, 749-750 (1984). *See also Loria v. Gorman*, 306 F.3d 1271, 1284 (2d Cir. 2002).

Since it is undisputed that the second floor front apartment at 1334 Clinton Street was expressly excluded from coverage under the search warrant at issue herein, the burden is on the government to establish that the S.W.A.T. team officers were legally justified in entering the second floor front apartment on February 9, 2008

without the benefit of either a search warrant or an arrest warrant.  It is also undisputed that on February 9, 2007, there were no arrest warrants for the arrest of Shane Baker, Shawn Baker or Jeremy Henderson.  (T. 116-117).

In its attempt to justify the warrantless entry by the S.W.A.T. team officers into the second floor front apartment on February 9, 2007, the government argues that there were "exigent circumstances" confronting the police officers at the time which justified their invasion of that apartment, *i.e.*, that their entry into the apartment was based on "police safety" and the justifiable need to conduct a "safety sweep" of that apartment.  (Docket #94).

It is without question that a "protective" or "safety sweep" is a search under the Fourth Amendment.  *Maryland v. Buie*, 494 U.S. 335, fn. 3, (1990); United States v. Gandia, 424 F.3d 255, 263 (2d Cir. 2005).

## 1.    The Issue Of "Exigent Circumstances:"

The Court of Appeals for the Second Circuit has provided the following guidelines in addressing the question of whether "exigent circumstances" exist that would justify an exception to the application of the Fourth Amendment to a warrantless entry into a private residence.

> Exigent circumstances provide an exception to the Fourth Amendment's warrant requirement.  *Coolidge v. New Hampshire*, 403 U.S. 443, 474-75, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).  "A district court's determination as to

whether exigent circumstances existed is fact-specific, and will not be reversed unless clearly erroneous." *United States v. MacDonald,* 916 F.2d 766, 769 (2d Cir. 1990) (en banc).

\*     \*     \*

The test to determine whether exigent circumstances exist "is an objective one that turns on . . . the totality of the circumstances confronting law enforcement agents in the particular case." *MacDonald*, 916 F.2d at 769. The core question is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer, *see United States v. Zabare*, 871 F.2d 282, 291, 292 (2d Cir. 1989), to believe that there was an "urgent need to render aid or take action," *MacDonald*, 916 F.2d at 769 (internal quotation marks omitted). . . .

The presence of exigent circumstances, of course, does not give government officials unfettered license to conduct a generalized search for evidence of criminal activity. Rather, the warrantless search "must be strictly circumscribed by the exigencies which justify its initiation." *Mincy v. Arizona*, 437 U.S. 385, 393, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (internal citation and quotation marks omitted).

*United States v. Klump*, 536 F.3d 113, 117-118 (2d Cir. 2008); *United States v. Medina*, 944 F.2d 60, 68 (2d Cir. 1991).

The Second Circuit Court of Appeals has adopted "six illustrative guides to aid in determining the need for quick action:

(1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause . . . to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry. *McDonald,* 916 F.2d at 769-70.

*United States v. Fields*, 113 F.3d 313, 323 (2d Cir. 1997).

Based on the testimony and evidence presented at the evidentiary hearing conducted by this Court, and considering the totality of the circumstances as they existed on February 9, 2007, it is the finding of this Court that the government has failed to establish a sufficient basis to justify the warrantless intrusion by the S.W.A.T. officers into the second floor front apartment.

The known lawful occupant of the second floor front apartment at the time of the raid and subsequent entry was an individual by the name of Jennifer Cheman. S.A. Friday testified that as part of their investigation, it was determined, "based on the electric utilities, . . . that a female named Jennifer Cheman lived in the front apartment" and "Jessica Cheman was also a name listed as her sister." (T. 71, 102). They also "observe[d] a vehicle that was registered to Jennifer Cheman" which "was parked on the side driveway at the residence . . . during the investigation." (T. 71-72). At no time was there any information or evidence known to the agents prior to February 9, 2007 that indicated in any way that Jennifer Cheman or Jessica Cheman, as the lawful occupants of the second floor front apartment, were in any way involved with illegal drug and/or weapons activity. The affidavit of S.A. Friday in support of the search warrant application supports the conclusion that the government had no reason to believe they were involved in such activity by reason of his own exclusion of "the apartment known as second floor front." (Government Exhibit 4, p. 2, ¶ 3).

The knowledge of the S.W.A.T. team about the premises located at 1334 Clinton Street and what was covered by the search warrant for those premises was limited to the information supplied by S.A. Friday in his briefings of February 8 and 9, 2007 to Captain Maraschiello and Detective Rinaldo.  (T. 20, 103-104).  As a result, it cannot be said that Detective Rinaldo and the other members of his S.W.A.T. team had a reasonable belief that Jennifer or Jessica Cheman, as the lawful occupants of the second floor front apartment, constituted a danger to them which warranted or justified a warrantless entry into that apartment.  In its Memorandum of Law (Docket #94), the government states that after the S.W.A.T. team completed its sweep of the second floor rear apartment, Detective Rinaldo "made the decision to search further on the second floor for other people as the S.W.A.T. team had already encountered one armed individual and were aware that a third person was also believed to reside in the premises (Tr. 13)."  (Docket #94, p. 12).  "Upon entering the small hallway, Detective Rinaldo knocked on the other door, announced 'police' and Shawn Baker opened the door.  (Tr. 14-15, 53).  Once Shawn Baker opened the door, Detective Rinaldo was also able to observe a white female, later identified as Jennifer Cheman, about 5 feet behind Shawn Baker (Tr. 15).  ***At that point, Detective Rinaldo believed that the door opened by Shawn Baker led to the front apartment*** (emphasis added).  (T. 15-16).  Once the door was opened by Shawn Baker, Detective Rinaldo also noticed the extremely strong smell of bulk marijuana coming from the front apartment.  (Tr. 16).  After Shawn Baker opened the door, Detective Rinaldo asked him who he was and Shawn Baker identified himself.  Thereupon, Detective Rinaldo and two S.W.A.T. team officers immediately entered the apartment and ordered Shawn Baker and Jennifer

Cheman to be seated on a couch and directed another officer to stand guard over them while he and the other officers conducted a "protective sweep."  At that point, while an officer stood with Shawn Baker and Jennifer Cheman, Detective Rinaldo and another officer did a quick security sweep of the apartment (Tr. 16)."  (Docket #94, pp. 12-13).

Not only does the government's statement establish the fact that Detective Rinaldo knew that he was standing in front of the second floor front apartment before he entered it, Detective Rinaldo's actions as well as his evidentiary hearing testimony establish that.  If Detective Rinaldo thought he was still in the second floor rear apartment, which was covered by the search warrant, why did he feel the need to "knock on the door" and announce "police" after he had vacated the living room of the second floor rear apartment?  (T. 13-14, 27-28, 53-54).  Detective Rinaldo testified that he knew prior to entering the building at 1334 Clinton Street that there were two separate apartments on the second floor, to wit, a "rear apartment" and a "front apartment."  Detective Rinaldo testified that he also knew prior to the time that he entered the building at 1334 Clinton Street that "the upper front apartment on the second floor was not part of the search warrant."  (T. 43).  He attempts to justify his entry into this apartment without a search warrant "based on the fact that [he] was given this name [Shawn Baker] as a person being involved in the operation and the fact that [they] had already recovered an assault weapon in the rear apartment and [he] did it for security reasons for [himself] and [his] fellow team members."  (T. 17).

Detective Rinaldo also testified that after he knocked on the door which was opened by a male who identified himself as Shawn Baker, he smelled a "strong [odor] of marijuana" which "smelled like bulk marijuana." (T. 15-16).

The government argues that:

> the strong smell of marijuana coming from the front apartment as well as the fact that Shawn Baker, another subject of the investigation was present within the front apartment, gave Detective Rinaldo additional reasons to legitimately conclude that the front apartment may harbor other individuals who could potentially pose a threat thereby justifying a brief protective sweep of the front apartment simply for the purpose of ascertaining whether additional persons were present in the front apartment.

(Docket #94, pp. 18-19).

This Court considers this reasoning to be misplaced.

First of all, the entry into the building at 1334 Clinton Street occurred at 6:35 a.m. on February 9, 2007, and the knocking on the door of the second floor front apartment occurred within a matter of minutes thereafter. (T. 32).

The "mere propinquity" of the second floor front apartment to the second floor rear apartment does not create a justification for a protective search or sweep of that apartment. (*See Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). "A person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person.").

Detective Rinaldo testified at the evidentiary hearing that he "had not heard anybody in that other [second floor front] apartment;" and that at that point in time, "there was no reason to believe that anyone else would be in that apartment." (T. 53, 30-31).

Safety or security sweeps or searches "may be conducted only when justified by a reasonable, articulable suspicion that the house is harboring a person posing a danger to those on the . . . scene." *Maryland v. Buie, supra* at 336; *United States v. Moran*, 376 F.3d 112, 117 (2d Cir. 2004); *United States v. Miller*, 430 F.3d 93, 95 (2d Cir. 2005).

As the Court of Appeals for the Second Circuit has stated:

> The *Buie* court explicitly declined to hold that the danger inherent in executing an arrest warrant will *ipso facto* justify a protective sweep. . . .  Officers must point to facts that give rise to an individualized suspicion and cannot rely solely on generalizations that suspects are usually accompanied by dangerous third parties.

*United States v. Gandia*, 424 F.3d 255, 263-264 (2d Cir. 2005).

The fact that Detective Rinaldo smelled a "strong [odor] of marijuana" which "smelled like bulk marijuana" did not justify a warrantless entry into the second floor front apartment for "odors alone do not authorize a search without a warrant." *Johnson v. United States*, 333 U.S. 10, 13 (1948).

The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. Crime, even in the privacy of one's own quarters, is, of course, of grave concern to society, and the law allows such crime to be reached on proper showing. The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent.

*Id.* at 13-14.

Detective Rinaldo's belief, no matter how well founded, that the second floor front apartment contained "bulk marijuana" based on what he "smelled" while standing outside that apartment, did not justify a warrantless entry into the apartment by the S.W.A.T. team for purposes of conducting a "protective search." Such search was unlawful "notwithstanding facts unquestionably showing probable cause." *Agnello v. United States*, 269 U.S. 20, 33 (1925). "Probable cause to believe contraband is present is necessary to justify a warrantless search, but it alone is not sufficient. . . . Mere probable cause does not provide the exigent circumstances necessary to justify a search without a warrant." *United States v. Rubin*, 474 F.2d 262, 268 (3d Cir. 1973);

*United States v. Coles*, 437 F.3d 361 (3d Cir. 2006). Furthermore, it is the government's position that the primary reason for the intrusion into the second floor front apartment by the S.W.A.T. team was to conduct a "protective sweep" based on "officer safety," not what may have been "smelled" by Detective Rinaldo.

Admittedly, the safety concerns of Detective Rinaldo under the circumstances that existed on February 9, 2007 at 1334 Clinton Street are understandable and the Court is empathetic as to the serious, dangerous situations police officers are confronted with on a daily basis. It certainly was reasonable for him to be concerned when only Shane Baker and Jeremy Henderson were found in the second floor rear apartment since he knew that a third individual was also a suspect in the illegal drug operation at the premises, to wit, Shawn Baker. (T. 13). However, when he knocked on the door of the second floor front apartment and announced "police," the door was opened by Shawn Baker, and Shawn Baker, in response to Detective Rinaldo's question, identified himself. (T. 14-15, 53-56). At this point, Detective Rinaldo could have asked Shawn Baker to step outside of the apartment, and upon compliance, he could have legally detained Shawn Baker for safety purposes while the search warrant was being executed. As an alternative, he could have asked permission from Shawn Baker or the female standing behind him in the apartment, namely Jennifer Cheman, for permission to enter the apartment for the purpose of conducting a "protective sweep." However, Detective Rinaldo chose not to do either of these and instead, by his own admission, after Shawn Baker identified himself, Detective Rinaldo, "with two other officers" walked through the doorway, told Shawn

Baker and Jennifer Cheman to be seated on a couch and directed an officer to stand guard over them while he and the other officers went through the second floor front apartment for the purpose of conducting a "protective sweep." (T. 56-57). No evidence has been presented to this Court that would establish or even reasonably imply that there were any other individuals in the second floor front apartment that would constitute a possible threat to the safety of the officers so as to justify a "protective sweep" of the apartment. Once again, it is emphasized that Shawn Baker and Jennifer Cheman were in plain view of the officers when the door to the apartment was opened. No evidence has been presented that would indicate that either one of them made a furtive move or took any other action that would create a sense of danger to the officers. No weapons were displayed or seen in this apartment. No one was seen running from the second floor rear apartment into this apartment at the time the officers entered the premises at 1334 Clinton Street or at the time they entered the second floor rear apartment.

No evidence was presented to establish that the S.W.A.T. team was concerned about destruction of evidence after allegedly "smelling bulk marijuana". Had they had such concerns, they could have secured the premises on the basis of probable cause to prevent destruction or removal of evidence while a search warrant was being sought. Segura v. United States, 468 U.S. 796,810 (1984).

At the time of the execution of the search warrant for the premises at 1334 Clinton Street, there were no arrest warrants for any of the suspects in the

investigation, namely, Shane Baker, Shawn Baker and Jeremy Henderson. Jennifer and Jessica Cheman were never considered suspects. It is also this Court's understanding that no arrests were going to be made of the suspects (defendants) at the time of the execution of the search warrant. As a result, it is this Court's belief that there was no legal justification for the S.W.A.T. officers to conduct a "protective sweep" of the second floor front apartment. As evident from the following language of the United States Supreme Court, legitimate "protective sweeps" are those "incident to an *arrest*:"[3] (Emphasis added).

> A 'protective sweep' is a quick and limited search of premises, **incident to an arrest** and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding.
>
> \*   \*   \*
>
> In Terry and Long we were concerned with the immediate interest of the police officers in taking steps to assure themselves that the persons with whom they were dealing were not armed with, or able to gain immediate control of, a weapon that could unexpectedly and fatally be used against them. In the instant case, there is an analogous interest of the officers in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack. The risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter. A Terry or Long frisk occurs before a police-citizen confrontation has escalated to the point of

---

[3] The Court is well aware of the Second Circuit Court of Appeals holding that " protective sweeps" may be conducted when officers are lawfully present in a home for a reason other than an in-home execution of an arrest warrant. *See United States v. Miller*, 430 F.3d 93 (2d Cir. 2005).

arrest. A protective sweep, in contrast, occurs as an adjunct to the serious step of taking a person into custody for the purpose of prosecuting him for a crime. Moreover, unlike an encounter on the street or along a highway, an inhome arrest puts the officer at the disadvantage of being on his adversary's "turf." An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings.

*   *   *

We are quite sure, however, that the arresting officers are permitted in such circumstances to take reasonable steps to ensure their safety after, and **while making, the arrest**. That interest is sufficient to outweigh the intrusion such procedures may entail.

*   *   *

We also hold that as an **incident to the arrest** the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched.

*   *   *

We should emphasize that such a protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found.

*   *   *

The type of search we authorize today . . . may be conducted only when justified by a reasonable, articulable suspicion that the house is harboring a person posing a danger to those on the **arrest scene**.

*   *   *

The Fourth Amendment permits a properly limited protective sweep in conjunction with an **in-home arrest** when the arresting officer possesses a reasonable belief based on

> specific and articulable facts that the area to be swept
> harbors an individual posing a danger to those on the **arrest
> scene**.

*Maryland v. Buie*, 494 U.S. 325, 327, 333, 334, 335, 336, 337 (1990) (emphasis

added).

      The government further attempts to justify the initial entry into the second

floor front apartment without a warrant by the S.W.A.T. officers by citing *United States*

*v. Miller*, 430 F.3d 93, 98-99 (2d Cir. 2005) in support of its position.  My reading of

*Miller* causes me to conclude otherwise since the government appears to create a

broader application of *Miller* than what that court's decision indicates.  The Second

Circuit Court of Appeals expressly stated:

> that an officer **lawfully** present in a **particular area of a
> home** may conduct a limited protective sweep of another
> area of **the home** provided the officer has reasonable
> suspicion that the other area harbors a threat to the safety of
> those on the scene.

*Id.* at 95 (emphasis added).

      The *Miller* court found that the officers were lawfully in the home pursuant

to a court order of protection issued against the defendant and that the "protective

sweep" was limited to following the defendant while he gathered his belongings from

his bedroom and that the articulated facts regarding threats and a weapon justified

such accompaniment. It was not a "sweep" of the entire apartment looking for unknown

individuals.  The crucial fact in *Miller* is that the officers were **lawfully** on the premises

pursuant to an order of protection.  No such order or other judicial process existed on

February 9, 2007 which authorized any entry by the officers into the second floor front apartment.

In the case at bar, we are dealing with **two separate, distinct homes**, *i.e.*, the second floor rear apartment which was covered by the search warrant and the second floor front apartment which was **expressly excluded** from the search warrant.

> For purposes of satisfying the Fourth Amendment, searching two or more apartments in the same building is no different than searching two or more completely separate houses. *United States v. Votteller*, 544 F.2d 1355, 1363 (6th Cir. 1976) (quoting *United States v. Hinton*, 219 F.2d 324, 325-26 (7th Cir. 1955)).  As a consequence, "when the structure under suspicion is divided into more than one occupancy unit, probable cause must exist for each unit to be searched."  *United States v. Whitney*, 633 F.2d 902, 907 (9th Cir.), *cert. denied*, 450 U.S. 1004, 101 S.Ct. 1717, 68 L.Ed.2d 208 (1981).

*United States v. Shamaeizadek*, 80 F.3d 1131, 1137 (6th Cir. 1996).

As the United States Supreme Court has admonished, "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.  *United States v. U.S. District Court*, 407 U.S. 297, 313 (1972); *Welsh v. Wisconsin, supra* at 748.  Once Detective Rinaldo and the other officers of the S.W.A.T. team crossed the threshold into the second floor front apartment, they made an entry into that apartment which was not lawfully sanctioned.  As a result, their "protective sweep" constituted an illegal search in violation of the Fourth Amendment.  A lawful "protective sweep" may only "be conducted when justified by a reasonable, articulable suspicion that the house is harboring a person posing a danger to those on the arrest

scene." *Maryland v. Buie, supra*. It is pointed out that the S.W.A.T. officers entered the premises at 1334 Clinton Street at 6:35 a.m., and entry into the second floor front apartment occurred shortly thereafter. It is this Court's understanding that law enforcement officers routinely execute drug search warrants at this time of day based on the belief and their experience that the suspects are in bed at that time thereby reducing the risk of danger from the presence of multiple persons in the premises to be searched. Since Detective Rinaldo already had Shawn Baker in his immediate sight, as well as Jennifer Cheman, there was nothing to indicate that other persons were present or might be present in the apartment who would constitute a danger to the officers. Absent such "reasonable, articulable suspicion," the officers had no valid legal basis to enter the apartment.

If one accepted the government's logic, the police or agents would be free to enter as many apartments as existed in close proximity to the apartment which had been lawfully entered under the guise of a "protective sweep." The Fourth Amendment does not tolerate such an invasion whether it be one apartment or multiple apartments.

This Court is cognizant of the various court decisions allowing warrantless entry "onto private property" for the purpose of "assit[ing] persons who are seriously injured or threatened with such injury" (*Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006)); "to fight a fire and investigate its cause; *Michigan v. Tyler*, 436 U.S. 499, 509 (1978)); "to prevent the imminent destruction of evidence" (*Ker v. California*, 374 U.S. 23, 40 (1963)); "to engage in hot pursuit of a fleeing suspect" (*United States v. Santana*,

427 U.S. 38, 42-43 (1976)).  This Court is also aware of the Second Circuit Court of

Appeals' ruling in *United States v. Miller*, 430 F.3d 93, 102 (2d Cir. 2005) that "the *Buie*

protective sweep doctrine may apply in situations other than the in-home execution of

an arrest warrant."  However, the Second Circuit also recognized that there is

nevertheless a requirement that an officer must first possess "articulable facts which

taken together with rational inferences from those facts, would warrant a reasonably

prudent officer in believing that the area to be swept harbors an individual posing a

danger to those on the scene."  *Id*. at 95; *Maryland v. Buie, supra* at 334.


      The fact that Detective Rinaldo may have subjectively believed that other

people might be hidden somewhere in the second floor front apartment because this

was a drug raid and Shawn Baker was present in that apartment and police experience

has established that drug dealers often meet with their contacts and are frequently

armed and dangerous was not legally sufficient to justify the warrantless entry into the

second floor front apartment.

> [S]uch generalizations, without more, are insufficient to
> justify a protective sweep.  *See United States v. Taylor*, 248
> F.3d at 514 (generalized suspicion that defendant was a
> drug dealer was inadequate, standing alone, to justify
> protective sweep); *cf. Buie*, 494 U.S. at 334 n. 2, 110 S.Ct.
> 1093 (noting that "[e]ven in high crime areas, where the
> possibility that any given individual is armed is significant, . .
> . reasonable, individualized suspicion [is required] before a
> [protective sweep] can be conducted").

*United States v. Moran Vargas*, 376 F.3d 112, 116 (2d Cir. 2004).

The burden is on the government "to establish specific and articulable facts that warranted the detective's belief that there was someone hiding in the second floor front apartment who posed a danger to them. The government has not provided any evidence to establish that.

### 2. A Second Illegal Search of The Second Floor Front Apartment:

This Court further finds that after the "protective sweep" of the second floor front apartment was completed by the S.W.A.T. team as aforesaid, S.A. Friday engaged in activity that constituted an illegal search by him of that apartment. More specifically, S.A. Friday testified that after the S.W.A.T. team secured the building at 1334 Clinton Street, he

> had a conversation with both Maraschiello and Dan Rinaldo where they both provided information to [him] regarding what occurred." Detective Rinaldo "indicated that when they knocked - - when they made entry and completed securing of that rear apartment area, they had opened the one door and knocked on the inner door at the rear of the living room, there the door was answered by an individual who identified himself to the officers as Shawn Baker . . . and they told [Friday] they had him [Shawn Baker] sit down and they conducted a security sweep of the apartment during which they found a marijuana grow operation in the front room of the apartment.

(T.80).

After S.A. Friday received the aforesaid information from Detective Rinaldo, he testified that he:

> Basically just got an overall observation of **everything** in the apartment and just got [his] bearings and [he] got it (sic) quickly and **got a glance at the grow**.

(T. 80) (emphasis added).

This entry into the second floor front apartment and obtaining an "overall observation of everything in the apartment" constituted an unlawful entry into and search of the second floor front apartment by S.A. Friday. His subsequent communication with the United States Attorney's Office as to what action he should take did not change or correct that unlawful entry and search of the second floor front apartment. The government cannot validly claim that the "overall observation of everything in the apartment" by S.A. Friday was allowed under the "plain view" doctrine.

> It is well settled that, under the "plain view" doctrine, law enforcement personnel may seize an item without a warrant provided that it is "immediately apparent that the object is connected with criminal activity," and further provided that the officers viewed the object from a lawful vantage point - i.e., that the officers "have not violated the Fourth Amendment in arriving at the place from where they can see" the object. *United States v. George*, 975 F.2d 72, 78 (2d Cir. 1992); *see also Horton v. California*, 496 U.S. 128, 136-37, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). The determination of lawful vantage point must focus on the activity which brought the object into plain view - here, the search of the briefcase by airport security personnel. As long as the scope of that initial search comported with the Fourth Amendment - i.e., was no more intrusive than necessary to accomplish its purpose of detecting weapons or explosives - then it is of no constitutional moment that the object found was not what was sought. As the district court correctly noted, "[t]hat lack of relationship *always* exists with regard to action validated under the 'plain view' doctrine."

*United States v. $557,933.89, More Or Less, In U.S. Funds*, 287 F.3d 66, 81-82 (2d Cir.

2002); *see also United States v. Scopo*, 19 F.3d 777, 782 (2d Cir.); *cert. denied*, 513 U.S. 877 (1994).

There was no legal justification for S.A. Friday to enter the second floor front apartment.

> Once police eliminate the dangers that justify a security sweep - safety of police, destruction of evidence, escape of criminals - they must, barring other exigencies, leave the residence. Were this not the rule, searches begun as minor intrusions on domestic privacy would expand beyond their legitimate purposes. This concern is particularly germane to government-citizen encounters where, as here, agents subsequently seek the resident's consent to search his domicile.

*United States v. Oguns*, 921 F.2d 442, 447 (2d Cir. 1990); *United States v. Isiofia,* 370 F.3d 226, 231 (2d Cir. 2004).

For the reasons previously stated, the information obtained by the S.W.A.T. team as to the contents of the second floor front apartment was illegally obtained. That information was "poisoned" by reason of such illegal entry and search and remained "poisoned" when passed on to S.A. Friday. As a result, it cannot validly be claimed that S.A. Friday had probable cause to enter the second floor front apartment without a warrant for purposes of making his own "observation" or "search." *Johnson v. United States*, *supra; Loria v. Gorman, supra.*

**B.    The Alleged Consent To Search The
        Second Floor Front Apartment:**

The government asserts that the subsequent search of the second floor

front apartment was lawful since such search was consented to by the defendant Shawn

Baker and Jennifer Cheman as reflected in Government Exhibit 14.


S.A. Friday testified that after he had been advised of the "security sweep"

and the observation of a "marijuana grow operation" in the second floor front apartment

by Detective Rinaldo, he contacted the U.S. Attorney's Office "to advise that a security

sweep had to be performed on the second floor front apartment and that during the

security sweep, a marijuana grow operation was discovered in plain sight and just to get

guidance and direction from the U.S. Attorney's Office."  (T. 88).  He further testified that

"basically a decision - - the initial decision was made to discuss the situation with Shawn

Baker in an attempt to obtain consent for the apartment (sic), and if consent was (sic)

not granted, we were going to proceed with applying for a search warrant for that

apartment as well."  (T. 88).


Unfortunately, the record of the evidentiary hearing does not reflect

whether the AUSA told S.A. Friday that the facts that were discussed in the telephone

conversation were or were not sufficient to procure a search warrant.  Since the decision

or advice of the AUSA to S.A. Friday was "to discuss the situation with Shawn Baker in

an attempt to obtain consent [to search] the apartment," this Court concludes that doubt

existed in the mind of the AUSA as to the legality of the "protective sweep" and "whether there was a likelihood that a search warrant could or would be obtained on the basis of the information then possessed." *See United States v. Vasquez*, 638 F.2d 507, 528 (2d Cir. 1980); *cert. denied* 454 U.S. 975 (1981).

S.A. Friday spoke to Shawn Baker and "basically explained to him that [they] had a search warrant for the entire building, excluding that apartment, **but due to the fact that a security sweep had been performed for the officer safety of the S.W.A.T. team and for [them] coming in afterwards, they found the marijuana grow operation in plain sight and as a result of that, [they] would have enough to apply for a search warrant and basically [they] could work something out as far as he was willing to be cooperative with [them] and truthful with [them] that [they] would be able to work on a 5(a) waiver to allow him to stay home that day."** (T. 89) (emphasis added).

Both Shawn Baker and Jennifer Cheman asked S.A. Friday what would happen if they did not consent to the search, and he responded that they did not have to consent and "that if they did not consent, [they] were going to apply for a search warrant and proceed on that route." S.A. Friday admitted that if the defendant did not consent, "he was going to be taken from the apartment and not be able to go to work." Thereupon, Shawn Baker and Jennifer Cheman "consented" to the search of the second floor front apartment by signing the "Consent To Search" form (Government Exhibit 14).

(T. 90, 132).

It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is '*per se* unreasonable. . . subject only to a few specifically established and well-delineated exceptions.' (citations omitted). It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent (citations omitted).

*Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

However, the burden of proving the validity of such consent to search rests with the government. *Schneckloth v. Bustamonte, Id.* at 222; *Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality opinion).

[W]hether a consent to search was in fact "voluntary" or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all of the circumstances. While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine quo non* of an effective consent.

*Schneckloth v. Bustamonte, supra* at 227; *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir. 1995).

As stated by the Court of Appeals for the Second Circuit:

The government has the burden of proving, by a preponderance of the evidence, that a consent to search was voluntary. *United States v. Calvente*, 722 F.2d 1019, 1023 (2d Cir. 1983). Voluntariness is a question of fact determined by a "totality of all the circumstances."

> *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 93 S.Ct.
> 2041, 36 L.Ed.2d 854 (1973). "[T]he ultimate question
> presented is whether 'the officer had a reasonable basis for
> believing that there had been consent to the search.'"
> *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir. 1995)
> (quoting *United States v. Sanchez*, 32 F.3d 1330, 1334 (8th
> Cir. 1994); *see Florida v. Jimeno*, 500 U.S. 248, 251, 111
> S.Ct. 1801, 114 L.Ed.2d 297 (1991). ("The standard for
> measuring the scope of a suspect's consent under the
> Fourth Amendment is that of 'objective' reasonableness - -
> what would the typical reasonable person have understood
> by the exchange between the officer and the suspect?").

*United States v. Isiofia*, 370 F.3d 226, 230-231 (2d Cir. 2004).

> In the case at bar,

> [T[he question to be resolved is whether the challenged
> evidence was "come at by exploitation of [the initial]
> illegality or instead by means sufficiently distinguishable to
> be purged of the primary taint."

*Segura v. United States,* 468 U.S. 796, 804-805 (1984); *Wong Sun v. United States*, 371

U.S. 471, 488 (1963).

The government argues that "should the court find that the protective

sweep was improper, the consent to search given by both Jennifer Cheman and Shawn

Baker was still valid" because "the taint of the initial entry into the apartment would have

been dissipated and did not otherwise affect the voluntariness of the consent to search."

(Docket #94, p. 31).  Admittedly, '[i]t has been well established for more than 60 years

that evidence is not to be excluded if the connection between the illegal police conduct

and the discovery and seizure of the evidence is 'so attenuated as to dissipate 'the taint.'

*Nardone v. United States, supra* at 341, 84 L.Ed. 307, 60 S.Ct. 266."  *Segura v. United*

*States*, 468 U.S. 796, 805 (1984).

"When a consent to search follows an illegal entry, this circuit requires the government to show more than voluntariness of the consent; it must also demonstrate that 'the taint of the initial entry has been dissipated' in order to admit evidence seized following the illegal entry." *United States v. Snype*, 441 F.3d 119, 132 (2d Cir. 2006); *United States v. Oguns*, 921 F.2d 442, 447 (2d Cir. 1990). *See also Wong Sun v. United States*, 371 U.S. 471, 486 (1963). Demonstrating purgation of "taint" is a burden of persuasion that rests with the government. *Kaupp v. Texas*, 538 U.S. 626, 633 (2003). *Brown v. Illinois, supra* at 604.

In determining whether there has been a purging of "taint" resulting from an illegal entry, the Supreme Court has provided the following factors as relevant to that consideration: (1) the giving of *Miranda* warnings, (2) the "temporal proximity" of the illegal entry and the alleged consent, (3) "the presence of intervening circumstances," and (4) "the purpose and flagrancy of the official misconduct." *Kaupp v. Texas*, 538 U.S. 626, 633 (2003); *Brown v. Illinois*, 422 U.S. 590, 603-604 (1975).

However, in the present case, I find, for the following reasons, that sufficient attenuation so as to dissipate the taint herein did not occur on February 9, 2007 and therefore reject the government's argument.

For the reasons hereinafter set forth, I find that the "consent to search" given by Shawn Baker and Jennifer Cheman was **not** the "product of [their] individual free and unconstrained choice" and, instead, was a "mere acquiescence in show of authority."

> The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of "objective" reasonableness - what would the typical reasonable person have understood by the exchange between the officer and the suspect?"

*Florida v. Jimeno*, 500 U.S. 248, 251 (1991).

The analysis set forth in the Court of Appeals decision in *United States v. Isiofia, supra* is applicable to the facts and circumstances in the case at bar in determining the validity of the consent given by Shawn Baker and Jennifer Cheman on February 9, 2007.

In considering the "totality of the circumstances" in this case, I regard the following circumstances of particular import in concluding that the "consent" given by Shawn Baker and Jennifer Cheman was not voluntarily given:

(1)     At 6:35 **a.m.** on February 9, 2007, ten (10) members of the Buffalo Police Department S.W.A.T. team, openly carrying rifles and shotguns, **broke down the door** at 1334 Clinton Street and ran up the stairs all yelling "police - search warrant" and in the process, shot a dog.  (T. 9-12).

(2)     Shortly after **6:36 a.m.** on February 9, 2007 (T. 32), Detective Rinaldo and two other S.W.A.T. team members "knocked on the second [floor front apartment] door "and in a loud voice announced "police," and when it was answered by Shawn Baker, Detective Rinaldo and the two S.W.A.T. team members immediately entered the apartment and ordered Shawn Baker and Jennifer Cheman to be seated on a couch and directed another officer to stand guard over them while he and the other officers conducted a "protective sweep" of that apartment.  (T. 14-16, 53-57).  Detective Rinaldo "had a shotgun slung," *i.e.*, he was carrying a shotgun that was exposed and observable to Baker when he opened the door.  The other two S.W.A.T. officers were armed "with either M4s or 12 gauge shotguns."  (T. 61-62).  Presumably, Shawn Baker and Jennifer Cheman heard the firing of a weapon just moments before this entry.

(3)     After the "protective sweep" was completed, Detective Rinaldo "told Officer Beatty to handcuff [Shawn Baker] and [Jennifer Cheman]" while he went to bring S.A.. Friday "into the apartment."  He then advised S.A. Friday "what happened when [they] executed the warrant."  (T. 18-19).  It was only a "matter of minutes" from the time he and the two S.W.A.T. team members first entered the second floor front apartment and he "got S.A. Friday."  (T. 34).

(4)     S.A. Friday testified that he entered the premises at 1334 Clinton Street "approximately five to ten minutes" after the "SWAT team breached the door." (T. 77-78).  He was briefed on the S.W.A.T. team discoveries and was told that "they had [Shawn Baker] sit down and they conducted a security sweep of the [second floor front]

-43-

apartment during which they found a marijuana grow operation in the front room of that apartment." (T. 78-80).

(5) S.A. Friday further testified that "maybe four or five minutes" elapsed "from the time [that he] first entered 1334 Clinton Street and [when he] saw Shawn Baker sit[ting] on the couch in the front apartment." (T. 81).

(6) S.A. Friday entered the second floor front apartment and "got an overall observation of **everything** in the apartment and just got his bearings [which he] got quickly and **got a glace at the grow** and basically just got everything set up for the other agents with [him] to initiate their searches of the apartment building as a whole." Shawn Baker and Jennifer Cheman remained handcuffed on the couch under the custody of an armed S.W.A.T. team officer. (T. 81) (emphasis added).

(7) S.A. Friday called the U.S. Attorney's Office and advised "that a security sweep had to be performed on the second floor front apartment and that during the security sweep, a marijuana grow operation was discovered in plain sight." S.A. Friday sought "guidance and direction" from the U.S. Attorney's Office and an "initial decision was made to discuss the situation with Shawn Baker in **an attempt to obtain consent for the apartment, and if consent was not granted, [they] were going to proceed with applying for a search warrant for that apartment as well."** (T. 88) (emphasis added). This "guidance and direction" indicates doubt existed in the mind of the AUSA as to the legality of the "protective sweep" and "whether there was a likelihood

that a search warrant could or would be obtained on the basis of the information then possessed."

(8)     S.A. Friday testified that "it was between forty-five minutes and an hour" from the time that he entered 1334 Clinton Street" before [he] got into any significant discussion" with Shawn Baker. (T. 87). Presumably a substantial period of this time was taken up in his discussion with the U.S. Attorney's Office. His discussion with Shawn Baker took place after he had discussed the situation with the U.S. Attorney's Office. S.A. Friday "basically explained [their] reason for being there" to Shawn Baker and told him that "**due to the fact that a security sweep had been performed for the officer safety of the S.W.A.T. team and for [their] coming in afterwards, they found the marijuana grow operation in plain sight and as a result of that, [they] would have enough to apply for a search warrant."** Jennifer Cheman was "also present during this conversation." (T. 89) (emphasis added).

(9)     S.A. Friday admitted that Shawn Baker "was concerned about going to work" (T. 130) and that he told Shawn Baker that "the easiest path for us to take is if you cooperate and are truthful with us we can conduct a Rule 5(a) waiver where he can stay home and go to work and do whatever he needs to do, **and as part of the cooperation he can provide a consent** [to search]" and that he, Friday, would "consider that cooperation" but that he, Baker, "wasn't required to cooperate with [them]." S.A. Friday further admitted that if Shawn Baker did not cooperate by signing the consent to search, "he was going to be taken from the apartment and not be able to go to work."

-45-

(T. 132).  He also admitted that they did not have an arrest warrant for Shawn Baker. (T. 116) (emphasis added).

      (10)    Both Shawn Baker and Jennifer Cheman specifically asked S.A. Friday what would happen if they did not consent to the search, and he responded that they did not have to consent and "**that if they did not consent, [the agents] were going to apply for a search warrant and proceed on that route.**"  Thereupon, Shawn Baker and Jennifer Cheman "consented" to the search of the second floor front apartment by signing the "Consent to Search" form (Government Exhibit 14).  (T. 90) (emphasis added).

      The alleged consent given by the defendant Shawn Baker and Jennifer Cheman (Government Exhibit 14) was given "close in time to what must have been a very startling, to say nothing of harrowing, series of events" on February 9, 2007 for the defendant and Cheman, namely the sound of a door being broken down; the sound of gun shots; the running and shouting by a number of armed police officers and agents; the banging on their apartment door and being confronted by three armed police officers; their being ordered to sit on a couch by armed officers and being guarded by one of the officers while the others rushed through their apartment; and then being handcuffed and ordered to remain on the couch while being guarded by an armed police officer.  It was only minutes later that S.A. Friday entered their apartment and "observed everything" including the "grow operation."

The fact that somewhere between "forty-five minutes and an hour" was all that elapsed from the time S.A. Friday first entered the building at 1334 Clinton Street and when he began his "significant discussion" with the defendant Shawn Baker and Jennifer Cheman tends toward a finding of coerciveness especially since this discussion took place while the defendant Shawn Baker and Jennifer Cheman were handcuffed and there were numerous agents on the scene.

The apartment of Jennifer Cheman and the defendant Shawn Baker was entered at 6:36 a.m. by a heavily armed S.W.A.T. team. Both the defendant and Cheman were placed under security of an armed S.W.A.T. team member while the other armed S.W.A.T. team members swept through their apartment. Almost immediately thereafter, the defendant and Cheman were handcuffed and continued to be secured under an armed guard until they were addressed only a few minutes later by S.A. Friday. (T. 81).

S.A. Friday did not give any *Miranda* warnings to the defendant or Cheman prior to conducting his conversation with them. Instead, he told the defendant and Cheman that

> due to the fact that a security sweep had been performed for the officer safety of the S.W.A.T. team and for [them] coming in afterwards, they found the marijuana grow operation in plain sight and as a result of that, [they] would have enough to apply for a search warrant and basically [they] could work something out as far as he was willing to cooperate with [them] and truthful with [them] and [they] would be able to work on a 5(a) waiver to allow him to stay

home that day.

(T. 89).

The defendant and Cheman specifically asked S.A. Friday what would happen if they did not consent.  (T. 90).  Shawn Baker also expressed his concern about going to work to S.A. Friday (T. 130).  It is this Court's opinion that S.A. Friday took advantage of that concern by telling the defendant that "the easiest path for [them] to take" was to "cooperate" and that in doing so, Shawn Baker could "stay home and go to work and do whatever he needs to do, and as part of the cooperation [Shawn Baker] can provide a consent [to search]," but that if he did not cooperate by signing a consent to search, "he was going to be taken from the apartment and not be able to go to work" (T. 132) even though they did not have an arrest warrant for Shawn Baker.  (T. 116).

Admittedly, S.A. Friday did advise Shawn Baker and Jennifer Cheman that they did not have to consent to a search of the apartment (T. 90) but that if they did not consent, the agents "were going to apply for a search warrant and proceed on that route."  Thereupon, the defendant and Jennifer Cheman "consented" to the search of the apartment.  (T. 90); (Government Exhibit 14).

This Court acknowledges that a statement by the agent that a search warrant would or could be obtained does not "automatically cause the search to be invalid."  *United States v. Kon Yu-Leung*, 910 F.2d 33, 41 (2d Cir. 1990); *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir. 1995).  *See also United States v. Miley*, 513 F.2d 1191,

-48-

1205 (2d Cir.), *cert. denied* 423 U.S. 842 (1975); *United States v. Bracer*, 342 F.2d 522, 524-525 (2d Cir.), *cert. denied* 382 U.S. 954 (1965).

However, if the defendant and Jennifer Cheman "consented" to the search because they were influenced by "misinformation" given by S.A. Friday that they could obtain a search warrant if they refused to consent, such evidence obtained from that search should be suppressed. *United States v. Boukater,* 409 F.2d 537, 538 (5th Cir. 1969). As indicated earlier, it appears that both S.A. Friday and the AUSA had serious doubts about whether a search warrant could be legally obtained and thus the reason for pursuing the "consent" of the defendant and Jennifer Cheman. As previously stated, the "protective sweep" was conducted in violation of the Fourth Amendment and the evidence observed during that illegal entry and search was tainted by reason of same and, therefore, would not provide a sound legal basis for obtaining a search warrant.

A finding of "coerciveness" resulting in the giving the "consent" to search is further supported by the defendant's expressed concern about having to report to work and being told that he would not be able to do so unless he agreed to cooperate by consenting to a search of the apartment. Jennifer Cheman, as the girlfriend and co-habitant of Shawn Baker in the apartment, understandingly would have similar concerns about the defendant being allowed to go to work and thus joined in the "consent." Coupled with this coercive threat is the fact that very little time had elapsed from the forced entry into the building and the firing of weapons; the entry by the armed S.W.A.T. team into the apartment of the defendant and Jennifer Cheman and the sweep of the

apartment; and the confrontation with S.A. Friday while handcuffed and under armed

guard of a S.W.A.T. team member and when the "consent" by the defendant and Cheman

was given. It is also pointed out that S.A. Friday apparently never advised Shawn Baker

of what crime he was being charged with or what evidence the government hoped to seize

before the consent to search was executed. Considering all these circumstances in their

totality, it is the opinion of this Court that "it was objectively unreasonable" for S.A. Friday

and the other agents to believe that the defendant's and Cheman's "consent" to search

their apartment were voluntary. *United States v. Insiofia, supra.* I further find that the

government has failed to demonstrate that "the taint of the initial entry" into the second

floor front apartment "has been dissipated."


### C.     The Search Of The Third Floor "Secret" Room:

The defendant Shane Baker ("the defendant") argues that the "third floor

room" was part of his second floor front apartment since "the only access point to this third

floor room was through the ceiling of the second floor front apartment marijuana grow

room." (Docket #93, pp. 20-21). As a result, he contends that since "the search warrant

specifically excluded the front apartment" and since "the room was completely sealed off

from the rest of the attic with the only means of access through the second floor front

apartment," the entry into this room and the seizure of evidence therefrom was illegal and

thus such evidence should be suppressed. (Docket #93, p. 22).


The government argues that the defendant is "attempt[ing] to turn that

portion of the third floor into something other than the third floor" (Docket #97, p. 16) and

counters that "it is unquestioned that the search warrant for 1334 Clinton Street authorized a search of the 'entire premises except upper front apartment'."  (Government Exhibit 5) (Docket #97, p. 16).

The search warrant for the premises located at 1334 Clinton Street describes the building as "a three floor building with a closed pizzeria store front on the first floor; [t]he second floor of the building consists of rear and front apartments" and authorizes a search of the "entire premises" at 1334 Clinton Street "except [the] upper front apartment."  (Government Exhibit 5).

In the affidavit submitted in support of the application for the search warrant authorizing a search at 1334 Clinton Street, S.A. Friday states "1334 Clinton Street, Buffalo, N.Y. is a three floor building with a closed pizzeria store front on the first floor; [t]he second floor of the building consists of rear and front apartments." (Government Exhibit 4, p. 9, ¶ 12).

The Application For Search Warrant describes 1334 Clinton Street as "a three floor building with a closed pizzeria store front on the first floor; [t]he second floor of the building consists of rear and front apartments."  (Government Exhibit 4).

It is emphasized that all of the aforesaid descriptions of the building located at 1334 Clinton Street, Buffalo, New York clearly define the front apartment as

being located on the "**second**" floor (emphasis added).  It is further emphasized that the search warrant at issue specifically authorizes a search of the "**entire** premises except [the] upper [second floor] front apartment."  (Government Exhibit 5) (emphasis added).

Access to the third floor of the building at 1334 Clinton Street was available by way of "a stairwell from the living room area of the second floor **rear** apartment that accesses the back half of the third floor" and also by way of a "stairwell from [the] small hallway **between** the apartments."  "[W]ithin the third floor there is also a doorway between the front and back halves of the **third** floor so from either the front or rear of the **third** floor attic area you can go across."  (T. 87, 110, 120-121) (emphasis added).

In response to this Court's question, S.A. Friday testified that the stairway leading to the third floor of the building located at 1334 Clinton Street could "be accessed from either the front or **rear** apartment."  (T. 86) (emphasis added).

When the agents first entered the third floor by way of the hall stairway, they observed a recently-built wall as well as "tools and drywall and equipment installation (sic) sort of laying around" making it "appear[ ] they were finishing the attic space into a room as opposed to an unfinished attic space and on the end there was a wall that had been freshly drywalled and had new drywall hung" which caused them to conclude that a "hidden space" had been recently constructed. (T. 96-98, 135).  The agents also "heard a

fan noise coming from [this hidden space]" which further validated their belief that "there was a hidden room or what attempted to be a concealed room in that space" on the third floor.  (T. 96-98).

In response to this Court's question, S.A. Friday admitted that "without forcibly entering [the hidden room by] breaking a wall, the only access point [into this room] was through the ceiling in the second floor front apartment."  (T. 96).  However, S.A. Friday did testify that the agents could have broken through this wall since they had tools with them that would enable them to do so.  (T. 134-135).

Instead of immediately breaking through the wall of the "hidden room" on the third floor, S.A. Friday asked Shawn Baker "how that area is accessed and he indicated through the ceiling of his apartment."  (T. 95-96).  The agents "ended up going through the bedroom ceiling" of the front apartment and entered the "hidden room" where the additional marijuana grow operation was found and seized.  (T. 98).  S.A. Friday considered this "hidden room" to be part of the **third** floor of the premises and, therefore, covered under the search warrant.  (T. 99).

"Warrants must be read in a 'common sense' fashion."  *United States v. Bianco*, 998 F.2d 1112, 1117 (2d Cir. 1993); *United States v. Ventresca*, 380 U.S. 102, 109 (1965).  Since the search warrant at issue expressly covered the "entire premises" at 1334 Clinton Street "except [the] upper front apartment" located on the second floor, common sense dictates that the "hidden room" located in the attic on the **third** floor was

-53-

covered by the warrant.  The fact that the agents may have had to break through the wall in order to gain entry into that "hidden room" is of no legal consequence.  Such breaking would have been no different than the breaking down of the door on the first floor of the premises.  As the United States Supreme Court has stated:

> A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search.

*United States v. Ross*, 456 U.S. 798, 820-821 (1982).

S.A. Friday further testified that he "consider[ed] that space [the "hidden room"] to be under the search warrant as far as (sic) part of the third floor" and that he and the other agents "would have just basically cut through the wall to gain access to that space if [they] couldn't otherwise do so to confirm there wasn't anything hidden behind that wall."  (T. 99).

Had the defendant refused to disclose entry into this third floor hidden room or refused to allow for such entry by the agents, Title 18 U.S.C. § 3109 would have been applicable thereby authorizing a forced entry or entry by breaking through the wall of the "hidden room" on the third floor.

> The officer may break open any other or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance . . .

18 U.S.C. § 3109.

The Supreme Court and the Second Circuit Court of Appeals have expressly held that "officers executing search warrants on occasion must damage property in order to perform their duty." *Dalia v. United States*, 441 U.S. 238, 258 (1979); Cody v. Mello, 59 F3d. 13, 16 (2d.Cir.1995).

The fact that the agents sought entry into this third floor "hidden room," through the ceiling in the second floor front apartment, after having been advised by the defendant of that entry mode, does not require that the evidence seized from the third floor "hidden room" be suppressed. Since the agents would have certainly found and seized the marijuana grow operation in the "hidden room" on the third floor by breaking through the wall, the doctrine of "inevitable discovery" applies, thereby bringing into play an exception to the exclusionary rule even if this mode of entry were deemed illegal.

> Exclusion of physical evidence that would inevitably have been discovered adds nothing to either the integrity or fairness of a criminal trial.

*Nix v. Williams*, 467 U.S. 431 (1984); *see also United States v. Eng*, 997 F.2d 987, 990 (2d Cir. 1993).

As the Court of Appeals for the Second Circuit has expressly held:

> Under the "inevitable discovery" doctrine, evidence obtained during the course of an unreasonable search and seizure should not be excluded "if the government can prove that the evidence would have been obtained inevitably" without the constitutional violation. *Nix v.*

*Williams*, 467 U.S. 431, 447, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *see also United States v. Eng*, 997 F.2d 987, 990 (2d Cir. 1993) (inevitable discovery doctrine "requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what *would have happened* had the unlawful search never occurred" (emphasis in original) (internal quotation marks omitted)). In essence, the inevitable discovery doctrine's application turns on a central question: Would the disputed evidence inevitably have been found through legal means "but for" the constitutional violation? If the answer is "yes," the evidence seized will not be excluded.

*United States v. Heath*, 455 F.3d 52, 55 (2d Cir. 2006).


In response to specific questions by this Court, S.A. Friday testified:


MAGISTRATE JUDGE SCHROEDER: If you went up those stairs [the middle hallway stairs] to the third floor area, that would not take you to the area where the third floor grow was on?

THE WITNESS: It takes you to the same physical space, but there was a wall that they had built. You basically need to go up to the stairs would enter you (sic) into an attic space, at the end of the attic space they built a wall. What appeared in just walking up those stairs from that middle hallway when you enter the attic space, it appeared there were tools and drywall and equipment installation (sic) sort of laying around. It appeared they were finishing the attic space into a room as opposed to an unfinished attic space and on the end there was a wall that had been freshly drywalled and had new drywall hung. And what appeared on initial glance was they started to finish that space and that was just the first wall they had drywall and what that wall was actually a partition for the hidden space.

MAGISTRATE JUDGE SCHROEDER: So, did you go into that space through that wall or did you go through the bedroom ceiling?

THE WITNESS: We ended up going through the bedroom ceiling since he told us that is how to access it.

MAGISTRATE JUDGE SCHROEDER: How did you know there was something in that?

THE WITNESS: When I looked at the way the wall was constructed, you could actually see the drywall or the wall was facing, you could actually see the end of drywall seams or seal going the other way, so clearly the space is going the other way beyond that wall, and when I looked at it in a little further detail, clearly that attic space was short compared to the length of the building. And I also heard behind that wall fan noises, which we could not identify from that second floor apartment like as a bathroom fan or a fan that you could hear in the second floor apartment at that point, so clearly they were behind the wall. There were no access point panels or doors in that wall.

(T. 97-98).

It is this Court's opinion that it was reasonable for the agents to believe that contraband and/or evidence of illegal drug activity might be concealed in this recently-constructed "hidden room." It was also reasonable for S.A. Friday to first seek information from the defendant about entry into ths room rather than immediately undertake destructive action in gaining entry into the room. I have no doubt that if the defendant had not disclosed such entry, or if he had refused to allow the agents entry through this apartment, the agents would have forcefully breached the wall of the "hidden room" and found the contraband that way.

Although the warrant in question expressly excluded the second floor front apartment, it did not objectively create a reasonable belief that anything on the third floor

of the premises at 1334 Clinton Street constituted part of the second floor front apartment. For that reason, the agents properly responded to the command contained in this valid warrant. *Maryland v. Garrison*, 480 U.S. 79 (1987).

Since the search of the third floor of the premises at 1334 Clinton Street was authorized by the search warrant, the entry into that third floor hidden room by means of a "separate act of entry," namely entry through the second floor front apartment, did not cause the search and seizure of evidence from that third floor "hidden room" to be illegal under the Fourth Amendment.

> [S]uppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule.

*United States v. Leon*, 468 U.S. 897, 918 (1984).

In considering the totality of the circumstances in this case, I conclude that suppression of the evidence seized from the third floor "hidden room" would not "further the purposes of the exclusionary rule."

### D. Shane Baker's Motion To Suppress The Evidence Seized From The Second Floor Front Apartment:

The defendant Shane Baker ("the defendant") asserts that he "has standing to move to suppress the evidence seized in the second floor front apartment." (Docket #90, p. 6). In support of this claim, the defendant argues that at the time of the execution of the search warrant at 1334 Clinton Street on February 9, 2007, he "was the

owner of the premises" and that he "leased the upper front apartment located on the second floor to Jennifer Cheman" and "as a condition of leasing those premises to Jennifer Cheman, [he] was provided with a second set of keys to that apartment" and that he "reserved [his] right to enter the premises at any time that [he] deemed appropriate." (Defendant's Exhibit 1).

The Court recognizes that it is common for landlords to retain a set of keys to premises that they lease to others for purposes of maintenance and emergencies. However, the Court does not accept the defendant's claim that under his asserted leasing provisions with Jennifer Cheman he obtained legal standing for Fourth Amendment purposes. As the United States Supreme Court has held:

> The rights assured by the Fourth Amendment are personal rights which may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure.

*Rakos v. Illinois*, 439 U.S. 128, 138 (1978).

In applying this principle, the Second Circuit Court of Appeals has stated that "a defendant has no right to have evidence suppressed on Fourth Amendment grounds unless the breached privacy expectation was his own rather than that of a third party." *United States v. Thomas*, 893 F.2d 482, 490 (2d Cir. 1990). *See Also United States v. Snype*, 441 F.3d 119, 130 (2d Cir. 2006). The fact that the defendant owned the premises at 1334 Clinton Street and was the landlord of Jennifer Cheman, the tenant of the second floor front apartment, "does not by itself justify a reasonable expectation of

privacy." *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 544 (6th Cir. 2003); *United States v. Cruz*, 475 F. Supp.2d 250, 253 (W.D.N.Y. 2007). The defendant has offered nothing of substance in further support of his claim of standing or expectation of privacy as to the second floor front apartment. As a result, I find that the defendant, as a matter of law, did not have a reasonable expectation of privacy as to the second floor front apartment and that his role of landlord of the premises is not sufficient to support his vicarious claim of a Fourth Amendment violation by reason of the search of the second floor front apartment and the seizure of evidence therefrom.

Furthermore, the defendant's motion for suppression of that evidence seized is deemed moot by reason of this Court's recommended finding in response to the co-defendant Shane Baker's motion to suppress.

### E. Shane Baker's Motion To Suppress The Weapons Found In 1334 Clinton Street:

The defendant Shane Baker ("the defendant") seeks to suppress the use of the weapons seized from 1334 Clinton Street as evidence at trial claiming such "seizure of weapons found in the house was improper." (Docket #90, p. 10). More specifically, he argues that "during the hearing, officers testified that they observed one weapon in defendant Shane Baker's second floor rear apartment" and that "the officers testified, however, that there was nothing illegal about the weapon (citing T. 118)." Therefore, counsel maintains that evidence at the hearing was sufficient to allow the Court to suppress from (sic) use in evidence any otherwise legal weapons which were found inside

the house."  (Docket #90, p. 10).  This argument of the defendant is totally without legal

merit.

The search warrant at issue expressly authorizes in the "schedule of items

to be seized" the following:

"( c ) firearms, ammunition . . ."  (Government Exhibit 5)

Such weapons seized, could be considered drug dealers'
"tools of the trade" and therefore, legally subject to
seizure pursuant to the warrant.  *See United States v.
Gaskin*, 364 F.3d 438, 457 (2d Cir. 2004).

## CONCLUSION

Based on the foregoing, it is hereby RECOMMENDED that:

(1)  the defendant Shawn Baker's motion to suppress use of the evidence

seized from the second floor front apartment be GRANTED;

(2)  the defendant Shawn Baker's motion to suppress the use of the

evidence seized from the third floor "hidden room" be DENIED;

(3) the defendant Shane Baker's motion to suppress the use of weapons

seized from the search of the second floor rear apartment and the third floor of 1334

Clinton Street be DENIED; and that

(4) the defendant Shane Baker's motion to suppress use of the evidence seized from the second floor front apartment be DENIED.

It is hereby

**ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Crim.P. 58(g)(2) and Local Rule 58.2.

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988). **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2 of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 58.2, or with the similar provisions of Rule 58.2 (concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.**

_**S/ H. Kenneth Schroeder, Jr.**_
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**

**DATED:** **Buffalo, New York**
**December 11, 2009**